IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| CLYDE PITT, | ) | CV 04-1500-HU |
| | ) | |
| Plaintiff, | ) | |
| | ) | FINDING AND |
| v. | ) | RECOMMENDATION |
| | ) | |
| JO ANNE B. BARNHART, Commissioner of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

ALAN STUART GRAF
KIMBERLY K. TUCKER
1020 SW Taylor Street, Ste 230
Portland Oregon 97205
        Attorneys for Plaintiff

KARIN J. IMMERGUT
United States Attorney
NEIL J. EVANS
Assistant United States Attorney
1000 SW Third Avenue, Ste 600
Portland Oregon 97204

STEPHANIE R MARTZ
Special Assistant United States Attorney
Social Security Administration
701 5th Avenue, Ste 2900 M/S 901
Seattle Washington 98104
        Attorneys for Defendant

HUBEL, Magistrate Judge:

Plaintiff Clyde Pitt brings this action for judicial review of a final decision of the Commissioner of Social Security denying his application for supplemental security income payments (SSI) under Title XVI of the Social Security Act. The court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). The Commissioner's final decision should be affirmed.

## BACKGROUND

Pitt was born August 17, 1960. He struggled in school and dropped out at the age of 16, later earning a high school equivalency diploma. In the 1990s, he completed a certified nurse assistant (CNA) course. Pitt worked as a CNA, dishwasher and food preparer. He stopped working on December 26, 1994, "because of all my back problems and stomach problems and mental problems." Tr. 65.[1] Pitt alleges he became disabled at that time due to "mental - depression - bad back and knees - cough up blood - bad bowels - carpal tunnel." *Id.* However, he did not file his application for benefits until July 10, 2002. Because SSI payments cannot be made retroactively, he cannot receive benefits for any period before he filed his application, even if he became disabled earlier. 20 C.F.R. §§ 416.203, 416.501. Social Security Ruling (SSR) 83-20.

---

[1]Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer.

## <u>DISABILITY ANALYSIS</u>

The Commissioner has developed a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. § 416.920. Pitt challenges the ALJ's evaluation of the evidence and findings at steps three, four and five of the sequential process.

At step three, the Commissioner must determine whether the claimant has impairments that meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. § 416.920(d). The criteria for these listed impairments, also called Listings, are enumerated in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing of Impairments). If the ALJ determines that the claimant's impairments meet or equal a Listing, the Commissioner will find the claimant disabled without completing the remaining steps in the sequence. At step three in this case, the ALJ determined that Pitt's medically determinable impairments of "anxiety, depression/dysthymia, a cognitive disorder, borderline intellectual functioning, paranoid personality disorder and polysubstance abuse in remission" and history of carpal tunnel syndrome were "not severe enough to meet or medically equal, either singly or in combination" any condition in the Listing of Impairments. Tr. 16.

If the adjudication proceeds beyond step three, the Commissioner must assess the claimant's residual functional capacity (RFC). The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by his impairments. 20 C.F.R. § 416.945(a); SSR 96-8p.

Here, the ALJ assessed Pitt's RFC as follows:

> The claimant is limited from lifting and carrying more than 25 pounds frequently with an occasional 50 pound maximum. He is limited to occasionally pushing or pulling levers. He is limited to occasional stair climbing and crawling. He is limited to occasionally firm gripping, holding and seizing. He has moderate limitations understanding, remembering, and carrying out detailed instructions, tolerating exposure to hazards, independently formulating plans and goals, independently making decisions, and working with others as part of a team. He is unable to work interacting with the public, or being in crowded situations. He may need to make lists or use notes. He is well able to follow an established routine.

Tr. 20.

At step four, the Commissioner must determine whether the claimant retains the RFC to perform work he has done in the past. If the ALJ determines that he retains the ability to perform his past work, the Commissioner will find the claimant not disabled. 20 C.F.R. § 416.920(e). The ALJ determined that Pitt's RFC did not preclude him from performing his past work as a dishwasher.

At step five, the Commissioner must determine whether the claimant can perform work that exists in the national economy. *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. § 416.920(e), (f). Here the burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can do. *Yuckert*, 482 U.S. at 141-42; *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). If the Commissioner meets this burden, then the claimant is not disabled. 20 C.F.R. § 404.1566.

In this case, although the ALJ completed his analysis at step four, he continued the sequential process by making alternative findings at step five. The ALJ found that even if Pitt were "further limited from lifting and carrying more than 10 pounds frequently with an occasional 20 pound maximum," and could not work as a dishwasher, he retained the RFC to work at a significant number

of jobs in the national economy. Tr. 19. He identified examples of such work, drawn from the testimony of the impartial vocational expert (VE): bench assembler; sedentary assembler; and egg washing machine operator. The ALJ concluded that Pitt was not disabled nor entitled to SSI payments.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Batson v. Commissioner of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

The ALJ is responsible for determining credibility, resolving conflicts in the medical evidence and resolving ambiguities. *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001). If the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the court may not substitute its judgment for that of the Commissioner. *Batson*, 359 F.3d at 1193. The Commissioner's decision must be upheld, even if the "evidence is susceptible to more than one rational interpretation." *Andrews*, 53 F.3d at 1039-40.

## DISCUSSION

Pitt challenges the ALJ's finding at step three that his impairments are not equivalent to any condition in the Listing of Impairments.

He contends the ALJ failed to assess accurately his RFC because the ALJ improperly discounted the opinion of an examining psychologist and discredited the testimony of Pitt and his

mother.  Pitt also contends the ALJ erroneously omitted some of his own findings from the RFC assessment.

Pitt asserts that the ALJ erred at steps four and five because he relied on inadequate vocational testimony elicited with a hypothetical question that did not reflect all of his functional limitations.

## I.  <u>Listing of Impairments</u>

Pitt contends the ALJ erred by failing to find that his impairments meet or equal Listing 12.05 *Mental Retardation* and/or Listing 12.02 *Organic Mental Disorder*.

The claimant has the burden of proving that he meets or equals the criteria for a listed impairment based on medical evidence.  *Sullivan v. Zebley,* 493 U.S. 421, 431 (1990); *Tackett v. Apfel,* 180 F.3d at 1100; 20 C.F.R. § 416.926.  The ALJ must compare "the symptoms, signs and laboratory findings . . . shown in the medical evidence . . . with the medical criteria shown with the listed impairment." 20 C.F.R. § 416.926(a).  In no case will the claimant's description of symptoms alone be sufficient to establish the presence of a physical or mental impairment.  20 C.F.R. § 416.929(b); SSR 86-8.

Listing 12.05 *Mental Retardation* refers to significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested before the age of 22.  The claimant can establish the required level of severity by showing:

> a valid verbal, performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05C.

The ALJ found that Pitt had multiple mental and physical impairments that were "severe" within the meaning of the regulations because they had significant impact on his ability to perform basic work activities. Tr. 16. Accordingly, the question of equivalence with Listing 12.05C turns on whether the record supports a valid measure of Pitt's IQ between 60 and 70. Pitt asserts that standardized testing administered by David Truhn, Psy.D., yielded Performance and Full Scale IQ scores in the requisite range.

Pitt underwent psychological evaluation by Dr. Truhn in July 2002. Dr. Truhn administered psychometric testing that included the Wechsler Adult Intelligence Scale - Third Edition. Pitt obtained a verbal IQ of 75, performance IQ of 69 and full scale IQ of 70.

The ALJ cannot determine equivalence based on raw IQ test scores. He must consider comments in the narrative report that accompanies test results regarding whether the IQ test scores are considered valid and consistent with the claimant's developmental history and degree of functional limitation. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(a).

Dr. Truhn's commentary suggested that Pitt's IQ test scores underestimated his IQ. Pitt reported difficulty seeing items on some of the tests and lacked corrective lenses. In addition, he reported wrist pain from carpal tunnel syndrome and wore braces on both wrists during the examination. Dr. Truhn stated "there is a chance that his performance skills were depressed due to his lack of corrective lenses and carpal tunnel." Tr. 146. Notably, Pitt scored "extremely low" on the performance sphere test measuring visual transcription and relatively higher on all other performance sphere tests. Tr. 143.

Pitt's responses on other tests also influenced the ALJ's interpretation of the IQ scores. Dr. Truhn administered academic testing which indicated that Pitt had reading and spelling skills

"significantly higher than expected given his Full Scale I.Q." Tr. 147. He administered the MMPI-2 personality inventory, which yielded an invalid profile typical of "individuals that tend to exaggerate symptoms." Tr. 144.

The ALJ did not accept the IQ test scores as a valid measure of Pitt's intellectual functioning. He found that Dr. Truhn's commentary and the academic test results showed that Pitt's IQ was higher than his IQ test results. The invalid MMPI profile suggested that his performance scores may also be depressed by exaggeration of symptoms. This interpretation is reasonably consistent with the medical evidence. The ALJ's interpretation of Dr. Truhn's findings is reasonable and should be upheld, despite the possibility of other reasonable interpretations of the same evidence. *Batson*, 359 F.3d at 1193; *Andrews*, 53 F.3d at 1039-40.

Listing 12.02 *Organic Mental Disorders* refers to abnormalities associated with a dysfunction of the brain. This Listing requires the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and the loss of previously acquired functional abilities. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.02. A claimant can demonstrate the required level of severity by showing: "current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." *Id* at § 12.02(C)(3).

Pitt has failed to identify previously acquired functional abilities lost due to an organic mental disorder. He has cited no medical evidence of a loss of mental functions. Indeed, he alleges mental impairments dating from childhood. Accordingly, even if he could show that his current living arrangement is highly supportive and medically necessary, he would not establish equivalence with the Listing.

## II.    RFC Assessment

Pitt contends the ALJ failed to accurately assess his RFC because the ALJ rejected the opinion of Dr. Truhn and discredited Pitt's testimony and that of his mother.

### A.    Medical Source Statement of Dr. Truhn

As previously described, Dr. Truhn performed a consultative psychological evaluation on July 9 and 10, 2002, "to determine the impact of [Pitt's] psychological functioning on his ability to maintain employment." Tr. 138. He administered standardized tests of IQ, academic achievement, cognitive function and the MMPI personality scale. Dr. Truhn interviewed Pitt, performed a mental status examination and reviewed medical records.

To summarize the test results, Pitt scored in the borderline range on IQ tests, but Dr. Truhn felt these underestimated his IQ because of the correctable problems with vision and carpal tunnel syndrome discussed above. Pitt's achievement test scores were in the low average range, exceeding his Full Scale IQ. He produced an invalid MMPI-2 profile typical of individuals who exaggerate symptoms.

Regarding vocational limitations, Dr. Truhn opined as follows:

> It does appear that he has difficulty with concentration and attention and that may present difficulties in a vocational setting. He also seems to have concerns regarding his ability to get along with others in a work setting and not be intimidated by them or to become angry.

Tr. 147.

In October 2002, Dr. Truhn completed a Mental Residual Functional Capacity (MRFC) report indicating marked limitation in a number of categories of function including the ability to remember and carry out simple instructions, maintain attention and concentration and respond

appropriately to instructions and criticism from supervisors. He completed a Rating of Impairment Severity worksheet, indicating marked impairment in "concentration, persistence or pace." Tr. 152-55.

The ALJ did not accept Dr. Truhn's findings of marked impairment in the indicated categories of function, and Pitt argues that he failed to provide specific, legitimate reasons for rejecting those findings.

An ALJ can reject the opinion of an examining physician that is inconsistent with the opinions of other physicians, if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The ALJ may reject a physician's disability opinion that is premised on the claimant's subjective symptom reports which the ALJ has already properly discredited. *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

As previously described, the ALJ found that Pitt's IQ test scores did not accurately represent his baseline level of intellectual functioning because Dr. Truhn's commentary and the academic achievement test results showed that Pitt's IQ exceeded his IQ test scores. In addition, Pitt's MMPI profile suggested that his performance scores may have been depressed by exaggeration of symptoms. The ALJ accepted that Pitt has significant intellectual deficits which moderately impair his ability to understand, remember and carry out detailed instructions. He did not accept Dr. Truhn's finding that marked impairment of intellectual functioning precluded even simple work.

Pitt now argues that Dr. Truhn was aware of his achievement test scores and MMPI profile and must have taken them into consideration when making his findings. Even if this were accepted, substantial evidence supports the ALJ's conclusion that Dr. Truhn's finding was incorrect. The ALJ was aware that Pitt had performed the demands of work for extended periods in the past. There is no evidence in the record of any event that would cause Pitt's intellectual ability to decline after he was able to work in the past.

Pitt also argues now that his reading achievement test score shows that he was able to see test items during Dr. Truhn's evaluation. Pitt believes this implies that poor vision did not artificially depress his IQ test scores. Accepting this argument would not help Pitt, however. Pitt told Dr. Truhn that he needed corrective lenses, but did not have any. The test score shows that Pitt sees well enough without corrective lenses to read the test questions. This fairly raises the question of credibility regarding Pitt's assertion of vision problems. The test score also shows that Pitt reads at high school level, far exceeding the level indicated by his IQ test scores.

The ALJ's interpretation of the evidence of Pitt's intellectual functioning is reasonable and should be upheld. Even if the interpretation asserted by Pitt is equally reasonable, the court cannot substitute it for that of the Commissioner. *Batson*, 359 F.3d at 1193; *Andrews*, 53 F.3d at 1039-40.

The ALJ did not accept Dr. Truhn's opinion that Pitt had marked impairment in attention and concentration. Dr. Truhn felt Pitt "demonstrated good persistence and used all of his allotted time on some items" but was unable to concentrate on others. Tr. 144. Pitt claimed that some items triggered ruminations about past events. Dr. Truhn accepted Pitt's report that he could not concentrate, but the ALJ was not persuaded that Pitt put forth full effort.

The ALJ relied on Pitt's MMPI profile suggesting that he exaggerated symptoms. Dr. Truhn's assumption that Pitt gave full effort during testing is unreliable because it may be based on exaggerated symptoms of impaired concentration. Dr. Truhn's finding was based primarily on Pitt's subjective report of interference from ruminations about past events. The MMPI profile and the ALJ's evaluation of Pitt's credibility provide substantial support for the ALJ's decision to discredit Dr. Truhn's suggestion that Pitt lacked the concentration to perform basic routine work.

The ALJ did not credit Dr. Truhn's opinion that Pitt had marked impairment in the ability to get along with others at work or respond appropriately to instructions and criticism from supervisors. Dr. Truhn reached this conclusion based entirely on Pitt's subjective description of altercations in his past work history.

Despite the factors suggesting that Pitt would be likely to exaggerate these symptoms, the ALJ accepted that Pitt's behavioral extremes interfered with work place functioning in the past. The ALJ acknowledged that "the primary reason that the claimant's work history is sporadic is that he does not get along with others well and has been prone to altercations with coworkers and supervisors." Tr. 18.

The ALJ did not accept that these behaviors precluded employment during the period that is relevant for this claim. Pitt described past difficulties in workplace functioning that predated treatment with psychogenic medications. Pitt has been under an effective medication regimen since several months before he filed his application for SSI payments.

Pitt's primary care physician, Michael Laurie, M.D., began Pitt on Celexa in March 2002 and increased the dosage over the next few months. On June 20, 2002, Pitt reported that his feelings of depression were improving on Celexa, although his affect remained "obviously flat" and he remained

anxious about finances. Tr. 222. Dr. Truhn's evaluation began on July 9, 2002, shortly after Dr. Laurie began treating his psychological symptoms and before he received the full benefit that treatment.

After Dr. Truhn's evaluation, Pitt reported continued improvement on increased doses of Celexa at regular visits with Dr. Laurie over the next 12 months. On July 23, 2003, Pitt reported that Celexa was still "helping to control his depression." Tr. 207. His affect was "fairly good, although he seems to be disappointed with his station in life." Tr. 208.

On August 26, 2003, Pitt was verbally abusive to Dr. Laurie's office staff when he appeared for a scheduled appointment. On September 9, 2003, he was noncompliant and unresponsive to Dr. Laurie's questions. He reported feeling irritable, but not lashing out at others. He reported fatigue, which Dr. Laurie attributed to depression. Dr. Laurie concluded that Celexa was no longer working and started him on Effexor XR.

After being on the new medication for three or four days, Pitt was "quite pleasant and relaxed, much improved from previous meetings." Tr. 257. Dr. Laurie continued to increase his dose and by December 2003, Dr. Laurie noted that "in general he feels well and is happy to report that Effexor XR is doing well controlling his temper and emotions." Tr. 254.

Based on Pitt's treatment history with Dr. Laurie, the ALJ could reasonably conclude that Pitt's symptoms were not fully treated at the time of Dr. Truhn's evaluation, and remitted in response to medication afterwards. The earlier difficulties Pitt experienced with coworkers and supervisors occurred before he began any medication and well before the period that is relevant for this claim. The single episode of verbally abusive behavior in August 2003 appears to have been a temporary

aberration. If it manifested a recurrence of psychological symptoms, they responded quickly to a change in medication.

The ALJ relied on Pitt's work history to show that he was capable of the mental functions required for basic work activities. Pitt claims life-long mental impairments. Even before receiving treatment, these impairments did not prevent him from earning a high school equivalency diploma, passing the CNA certification course, or working for sustained periods of about six months at a time.

Pitt argues that the ALJ took his work history out of context and ignored that he quit or was fired from his past jobs because he was overwhelmed. This is not supported by the record. As previously described, the ALJ accepted that Pitt's untreated behavioral extremes were the primary reason his work history was sporadic. The ALJ could reasonably conclude from Pitt's work history that his mental deficits do not preclude all work when his behavioral extremes are properly treated with medication.

In summary, the ALJ performed a reasonable evaluation of the medical evidence and provided specific, legitimate reasons for rejecting parts of Dr. Truhn's opinion. His conclusion should be upheld.

**B.** **Pitt's Credibility**

Pitt testified that he has lived with his mother and stepfather most of his life. He lived on his own for a short time in the distant past and "functioned pretty well as far as taking care of myself and all that," but could not hold a job to pay the rent. Tr. 270. He had difficulty in school with learning and understanding. He required special education for reading. He was harassed by classmates and often missed field trips due to nervousness and upset stomach.

Pitt testified that he worked as a dishwasher at a restaurant, but was fired for missing too much work due to stomach problems and a bad back. He then worked in a fast food restaurant preparing food and waiting on tables. Waiting on tables made him nervous, but he got along well with the customers. He was most nervous when the restaurant was crowded and busy.

Pitt testified that he worked as a CNA in a rest home for elderly residents. He completed a training program on the job and passed a test to obtain a CNA certificate. He did not miss work often. He loved working with the elderly residents and did not have any problem getting along with any of them. When he felt stress, he would "get lippy" with others on the job. Tr. 286. Pitt found it stressful when he had to help a resident dress and could not decide what the resident should wear. Filling out charts also "made it real difficult." Tr. 323.

Pitt testified that he did volunteer work in the past, visiting elderly people who were homebound. He used the bus for transportation for this volunteer work. He testified that he does not use the bus anymore because he cannot walk to the bus stop and gets confused and lost if he tries to navigate on his own. He testified that he uses a bicycle for transportation, and takes the bus occasionally if his mother or stepfather can accompany him so that he does not get lost and confused. He conceded that he could probably use the bus to go to the same place everyday without getting lost. He does not have problems getting along with people on the bus, but believes he would become paranoid and depressed if it were crowded.

Pitt testified that a spine specialist told him not to lift more than 5 pounds. He can lift a 12 to 13 inch television set. He has lost some of the use of his hands, but carpal tunnel surgery helped a great deal. Pitt takes over-the-counter medication for pain.

He testified that major depression makes him feel "bummed out," gives him low energy, makes it hard to deal with life and causes sleep problems. Tr. 298. In addition, he has "paranoia" which he describes as nervousness when he is around a lot of people. Tr. 303. For example, he will not shop in a store that is crowded, but has no difficulty if it is not busy. He takes Effexor, an antidepressant, which "helps real well." Tr. 293, 322.

Pitt testified that he has difficulty with anger. He does not get violent, but stress causes him to get angry and yell at people. He argues and takes offense easily in his conversations with family members and does not participate in social activities.

Pitt testified that he has a bad memory and sometimes forgets to take his medications or turn off the burner on the stove. He also claims concentration problems make it difficult for him to follow long movies on television. He does not feel that he could live on his own because he is too forgetful and would have difficulty remembering to pay his bills.

The ALJ found Pitt's testimony and allegations not fully credible to the extent he alleged greater functional limitations than set forth in the ALJ's RFC assessment. His RFC assessment did not reflect any vocationally significant functional limitations from low back pain, abdominal pain, fatigue or general malaise. The RFC assessment acknowledged that Pitt has significant limitations in the use of his hands from carpal tunnel syndrome and psychological impairments that limit his cognitive functions, independent decision-making and social functions. The ALJ rejected Pitt's assertion that these limitations are so severe that he cannot work.

It was not error for the ALJ to disregard Pitt's testimony regarding limitations from low back pain, abdominal pain, fatigue or general malaise. The ALJ must assess the credibility of the claimant regarding the severity of symptoms only if the claimant produces objective medical evidence of an

underlying impairment that could reasonably be expected to produce the symptoms. *Smolen v. Chater*, 80 F3d 1273, 1281-82 (9th Cir 1996); *Cotton v. Bowen*, 799 F2d 1403, 1407-08 (9th Cir 1986).

Pitt failed to produce objective medical evidence of an underlying impairment that would produce debilitating back pain. He complained of low back pain to Dr. Laurie in July 2000. The pain was "intermittent" and "brought on when he twists or turns in a certain position." Tr. 234. It did not radiate. He was not tender to palpation. Clinical measures, such as straight leg raises, were negative. Pitt did not require pain medication and he declined any further treatment. Diagnostic images of the spine were normal except for "minimal generalized end-plate irregularity." Tr. 249. There is no objective medical evidence to support Pitt's claim that he is disabled by a "bad back" or "back problems." Tr. 65.

Pitt failed to produce objective medical evidence of any underlying impairment that would produce debilitating abdominal pain. On August 24, 2000, he told Dr. Laurie that "on rare occasions he gets upper abdominal pain after he eats a very large meal but this is only intermittent." Tr. 232. Dr. Laurie noted that this came on only with excessive food. Pitt declined any further work-up. He complained of abdominal pain again three years later and Dr. Laurie began him on Zantac. Pitt declined any further gastrointestinal evaluation. Tr. 206-09. There is no objective medical evidence to support Pitt's claim that he is disabled by "bad bowels" or "stomach problems." Tr. 65.

Pitt alleged disability due to "cough[ing] up blood," but the objective medical evidence does not support any significant functional limitations from this. Pitt complained to Dr. Laurie of chronic cough on several occasions. On March 26, 2002, he reported "he had coughed up blood over a year

ago, but none since." Tr. 229. Diagnostic images of the chest in July 2000, March 2002, and May 2003, were clear and indicated "no active cardiopulmonary process." Tr. 230, 240, 245, 250.

Pitt also alleged disability due to bad knees and testified that he could not longer walk to the bus stop. Despite seeing Dr. Laurie regularly for a multitude of ailments, Pitt apparently did not seek treatment for problems with his knees. He failed to identify any objective medical evidence of an underlying impairment that could reasonably be expected to produce significant functional limitations in the knees.

It was not error for the ALJ to discredit Pitt's claim that limitations from carpal tunnel syndrome and psychological impairments are so severe that he cannot work. An ALJ may discredit a claimant's testimony regarding the severity of symptoms by providing clear and convincing reasons for doing so. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Smolen v. Chater*, 80 F.3d at 1283.

The ALJ may consider objective medical evidence and the claimant's treatment history as well as any unexplained failure to seek treatment or follow a prescribed course of treatment. *Smolen*, 80 F3d at 1284. The ALJ may also consider the claimant's daily activities, work record and the observations of physicians and third parties with personal knowledge about the claimant's functional limitations. *Id.* In addition, the ALJ may employ ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms and other statements by the claimant that appear to be less than candid. *Id. See also* SSR 96-7p.

The ALJ accepted that Pitt had significant limitations from carpal tunnel syndrome, but concluded that he remained capable of medium exertion as long as he limited the use of his upper extremities. In May 2002, Pitt complained of tingling and numbness in the fingers with occasional pain in the forearms. Carpal tunnel wrist splints did not help. Nerve conduction studies confirmed

that he had severe bilateral carpal tunnel syndrome. In July 2002, Pitt chose to defer treatment until the fall.

In August 2002, Kenneth Butters, M.D., an orthopedic surgeon, examined Pitt and completed a physical limitations worksheet. Dr. Butters indicated that Pitt should use his hands only occasionally and noted in the margin: "no repetitive use of hands." Tr. 201. Significantly, Dr. Butters did not impose any limitation on Pitt's ability to walk or lift or perform any other physical functions. It is also significant that this assessment preceded carpal tunnel surgery.

In October 2002, Dr. Butters performed an endoscopic nerve decompression on the right wrist. In November 2002, Pitt told Dr. Laurie that the pain, tingling and numbness had resolved. He complained of hand weakness, but declined the therapy Dr. Laurie offered. In January 2003, Dr. Butters performed the same procedure on Pitt's left wrist. Pitt did not seek treatment for symptoms of carpal tunnel syndrome thereafter.

The ALJ relied on the findings of state agency medical experts who reviewed Pitt's medical file and concluded that he remained capable of the exertion required for medium work with limited bilateral gross manipulation, due to carpal tunnel syndrome. Tr. 174-82. The objective medical evidence, treatment history, Dr. Butters' assessment and Pitt's subjective statements about improvement in his symptoms after carpal tunnel surgery support the ALJ's assessment that he can push, pull, grip, hold and seize at least occasionally. There is no persuasive evidence that he has any other physical limitation. Accordingly, the ALJ did not err by concluding that Pitt's assertion of physical limitations in excess of his RFC assessment were not credible.

The ALJ did not accept Pitt's claims of disabling limitations from difficulty with anger, nervousness around crowds of people and poor memory and concentration. He accommodated these

limitations by significantly restricting Pitt's RFC. The restrictions preclude work interacting with the public or being in crowded situations and allow for moderate limitations following detailed instructions, independently making decisions and working with others as part of a team. They require that he be able to use lists or notes to remember work tasks. The ALJ discredited Pitt's testimony to the extent he claimed limitations exceeding the RFC.

As described previously, the ALJ acknowledged that Pitt has experienced difficulty getting along with others in the work place. The ALJ believed Pitt overstated these difficulties. Pitt testified that he got "lippy" with coworkers when he came under stress while working as a CNA, but "manage[d] not to get smart" with the rest home residents. Tr. 286. The ALJ found that this showed he could control his behavior. In addition, these workplace difficulties predated his treatment with Effexor which by every available report appears to have improved his ability to control his temper and emotions.

The ALJ relied on Pitt's work history to demonstrate that he was able to understand, remember and concentrate well enough to perform the basic work activities required in his past work and to use public transportation to get to and from work. There is no basis in the record for concluding that Pitt's long-standing psychological limitations worsened after he was employed.

Based on the foregoing, the ALJ articulated clear and convincing reasons supported by substantial evidence in the record for discrediting Pitt's assertions that he has limitations in excess of those in his RFC assessment and that he cannot perform any work. Accordingly, I recommend that the Court affirm the ALJ's credibility determination regarding plaintiff.

### C.    <u>Lay Witness Statements</u>

Pitt's mother, Jean Roudebush, testified that he has lived at home most of his life. He "can't make it on his own," because of "a lack of responsibility" and "no self confidence." Tr. 331. He had difficulty getting along with other students and some of his teachers in school and had a hard time learning.

Ms. Roudebush testified that Pitt's depression makes him think he cannot not do anything; he feels that everyone is against him and that most people hate him. He stays in his room all day and comes out after she and her husband go to bed. He goes for days without leaving the house. He does not bathe, launder his clothes or clean his room.

Ms. Roudebush testified that Pitt was threatening before starting medication. She and her husband were afraid of him and he would yell at their neighbors. More recently she is no longer afraid of him: "Since they put him on this medication, he has calmed down a great lot." Tr. 335.

Ms. Roudebush testified that Pitt talks and argues with himself. She thinks he has problems with memory, because he sometimes forgets to take his medication. She thinks he has problems with concentration, because it takes him a long time to write a grocery list.

Pitt argues that the limitations Ms. Roudebush described are enough to establish that Pitt is disabled. Friends and family members and others in a position to observe a claimant's symptoms and daily activities are competent to testify as to the claimant's condition. *Dodrill v. Shalala,* 12 F3d at 918. Such testimony cannot be disregarded without comment. *Nguyen v. Chater*, 100 F3d 1462, 1467 (9th Cir 1996). If the ALJ wishes to discount lay witness testimony, he must give reasons that are germane to the witness. *Id.*

It does not appear, however, that the ALJ rejected Ms. Roudebush's testimony. He found that her testimony did not "establish that (with treatment) the claimant's current mental function is below baseline level, or support a finding that he is unable to work." Tr. 19. He relied on Ms. Roudebush's testimony that Pitt's behavior had improved with medication. He relied on Pitt's testimony regarding his ability to behave appropriately with rest-home residents to conclude that his behavioral extremes were not entirely involuntary.

The ALJ did not disregard the lay witness testimony without comment. He considered the testimony and drew reasonable conclusions from it in context with the record as a whole.

### D.    Omitted Findings

Pitt challenges the ALJ's RFC assessment because it does not contain limitations on his interactions with supervisors and coworkers, but merely limits him from working as part of a team. He contends the RFC assessment fails to reflect the ALJ's own finding that "a primary reason that the claimant's work history is sporadic is that he does not get along with others very well, and at times has been prone to altercations with coworkers and supervisors." Tr. 18.

As described previously, the ALJ found that Pitt's past workplace difficulties of this kind occurred before he began an effective medication regimen. He also found that Pitt's behavioral extremes in his past work were not entirely involuntary or signs of uncontrollable loss of function. Accordingly, the ALJ did not omit his own findings.

In summary, the ALJ did not erroneously reject the opinion of Dr. Truhn, Pitt's testimony or the testimony of Ms. Roudebush. He did not omit his findings from his RFC assessment. The RFC assessment reflects a reasonable interpretation of the record as a whole and the court should not disturb that interpretation.

### III.    Adequacy of the Vocational Evidence

The ALJ found that Pitt retained the RFC to return to his past work as a dishwasher, or to perform other work in the national economy as a bench assembler, sedentary assembler and egg washing machine operator. In doing so, he relied on VE testimony elicited with a hypothetical question based on his RFC assessment.

Pitt contends the hypothetical question was faulty because it did not reflect all of his functional limitations. Vocational expert testimony based on a hypothetical question that does not reflect all of the claimant's limitations has no evidentiary value. *Embrey v. Bowen*, 849, F.2d 418.422 (9th Cir. 1988).

Pitt contends the hypothetical question did not reflect all of the impairments shown in the medical source statement of Dr. Truhn and the testimony of Pitt and his mother. This contention cannot be sustained because the ALJ properly evaluated that evidence and reached an RFC assessment that reflected the limitations it reasonably supported. He elicited testimony from the VE with a hypothetical question that included all the limitations in his RFC assessment. Consequently, Pitt has failed to present any basis for rejecting the vocational testimony.

### RECOMMENDATION

Based on the foregoing, the Commissioner's determination that Pitt does not suffer from a disability and is not entitled to SSI payments under the Social Security Act is based on correct legal standards and supported by substantial evidence. The Commissioner's final decision should be affirmed and the case should be dismissed.

**<u>SCHEDULING ORDER</u>**

The above Findings and Recommendation are referred to a United States District Judge for review.  Objections, if any, are due January 19, 2006.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, a response to the objections is due February 2, 2006, and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

DATED this <u>4th</u> day of January, 2006.


<u>/s/ Dennis J. Hubel</u>
Dennis J. Hubel
United States Magistrate Judge